IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RAYMOND ROGELIO INNISS, | ) | |
| #304894, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:17-cv-188-RAH-WC |
| | ) | [wo] |
| | ) | |
| KARLA JONES, WARDEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

I.     **INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Plaintiff Raymond Rogelio Inniss ("Inniss" or "Plaintiff"), a state inmate, in which he challenges conditions present during his term of incarceration at the Ventress Correctional Facility. Specifically, Inniss alleges that the defendants denied him adequate medical treatment for ailments resulting from a 2013 car wreck upon his transfer to Ventress in August 2016 and denied him adequate medical treatment for injuries received in an altercation with a fellow inmate on December 30, 2016.  (Doc. 10 at pp. 2–3; 7–26.)[1]  He also alleges that the defendants failed to respond to his grievances.  (Doc. 26 at p.8).  Inniss names Karla Jones, Warden at Ventress Correctional Facility in her individual and official capacities.  He also names as defendants in their individual and official capacities, medical providers including

_____

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

John Peasant, M.D., Nettie Burks, RN, Dianne Teal, LPN and Amy Matthews, LPN.  Inniss seeks monetary damages for the alleged violations of his constitutional rights and requests "to be seen by a neck and back specialist and a foot specialist that are not affiliated with the State of AL or D.O.C. of AL."  (Doc. 10 at p. 5).

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Inniss' medical records, addressing the claims raised in the complaint, as amended.  In these documents, the medical and correctional defendants maintain they did not act with deliberate indifference to Inniss' medical needs.  (Docs. 21, 33, 46)

After reviewing the special reports filed by the defendants, the court issued an order on July 21, 2017, directing Inniss to file a response to each of the arguments set forth by the defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  (Doc. 36).  The order specifically cautioned that "**unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law."  (Doc. 36 at p. 2).  Clark filed a sworn response to this order on August 21, 2017.  (Doc. 42).  He later filed a supplemental sworn response on October 30, 2017.  (Doc. 55).  Pursuant to the directives of the order entered on July 21, 2017, the court now treats

the defendants' report as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.   FACTS

The plaintiff was transferred to Ventress in August of 2016.   Previously in November of 2013, the plaintiff was involved in a car wreck that resulted in a shoulder, neck, back and foot injury, which he claims continued to cause him pain upon his placement at Ventress.   (Doc. 10 at pp. 3, 6).  The plaintiff admits that he has "been seen many times by the medical staff here at Ventress," but alleges that he has been refused "adequate care."  (Doc. 10 at p. 7).  He also claims that he filed a medical grievance in November of 2016 but received no response.  (Doc.  10 at p. 8).

Specifically, he alleges that the medical personnel at Ventress failed to provide him enough pain and asthma medications.  (Doc. 10 at p. 9).  Also, he claims that on December 30, 2016, after  he  was  involved  in  an  altercation  with  another  inmate,  he  received insufficient  medical  treatment  for  the  stab  wounds  to  his  face  and  head.   He  admits, however, that within a couple of hours of the altercation he was seen by medical personnel, x-rays were taken, and steri-strip bandages were applied to his wounds.  (Doc. 10 at p. 11). He also admits that he was seen again by medical personnel on the evening of December 30th and his wounds were cleaned and rebandaged.  (Doc. 10 at p. 12).

He further states that on December 31, 2016, he was seen by medical personnel because he was vomiting and could not breath.  He admits that he was given an inhaler and "his  breathing  returned  to  normal"  and  his  wounds  were  cleaned  and  rebandaged. Additionally, the plaintiff states that he was given two shots which contained an antibiotic

3

and pain medicine and that his blood was drawn for lab work.  (Doc. 10 at pp. 13-14).  He

also states on January 2, 2017, that he was seen by Dr. Peasant and explained that he needed

his pain and nerve medication to be increased "to what the plaintiff has taken for several

years which is double to what plaintiff is being given now, which does not control

plaintiff's pain at all but just suppresses enough of plaintiff's pains to allow the plaintiff

some functioning without as much pain."  (Doc. 10 at p. 15).  He states that he was again

given shots for pain and infection.  (Doc. 10 at p. 16).

## II.    DISCUSSION[2]

### A.    Absolute Immunity

To the extent Inniss lodges claims against the defendants in their official capacities

and seeks monetary damages, the defendants are entitled to absolute immunity.  Official

capacity lawsuits are "in all respects other than name, . . . treated as a suit against the

entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has

held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by
> private parties against States and their agencies [or employees]. There are
> two exceptions to this prohibition: where the state has waived its immunity
> or where Congress has abrogated that immunity. A State's consent to suit
> must be unequivocally expressed in the text of [a] relevant statute. Waiver
> may not be implied. *Id*.  Likewise, Congress' intent to abrogate the States'
> immunity from suit must be obvious from a clear legislative statement.

---

[2] The court limits its review to the allegations set forth in the complaint, as amended.  (Docs. 1, 30). *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution).  "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.1990)).  In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).  The Court will now address the claims against the defendants in their individual capacities.

**B.     Deliberate Indifference Generally**

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments

Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834–38, 114 S. Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324–25, 115 L. Ed. 2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id*.

## C.    Deliberate Indifference to Medical Needs.

Inniss alleges that the defendants denied him adequate medical treatment for ailments resulting from a 2013 car wreck upon his transfer to Ventress in August, 2016 and denied him adequate medical treatment for injuries received in an altercation with a fellow

inmate on December 30, 2016. (Doc. 10 at pp. 2–3; 7–26.) He also alleges that the defendants failed to respond to his grievances. (Doc. 10 at pp. 7–8). Specifically, he alleges that the defendants failed on numerous occasions to provide him with sufficient pain and asthma medications (Doc. 10 at pp. 10–26) and have failed to refer him to a doctor "specializing in neck, back, and foot injuries." (Doc. 10 at p. 16.). Furthermore, to the extent Inniss can be understood to complain that the correctional defendant, Warden Jones, is responsible for ensuring that he received appropriate medical treatment, the court will also address that argument. These assertions entitle Inniss to no relief.

### 1.   Standard of Review.

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate

indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248,1255 (11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an

excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery Cty. Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotation marks). To show deliberate indifference, the plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (citation and internal quotation marks omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a

serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm.").

### 2.     Medical Defendants.

Inniss asserts that the defendants denied him adequate medical treatment for ailments resulting from a 2013 car wreck upon his transfer to Ventress in August, 2016 and denied him adequate medical treatment for injuries received in an altercation with a fellow inmate on December 30, 2016.  (Doc. 10 at pp. 2–3; 7–26.)  He also alleges that the defendants failed to respond to his grievances.  (Doc. 10 at pp. 7–8).  Specifically, he alleges that the defendants failed on numerous occasions to provide him with sufficient pain and asthma medications (Doc. 10 at pp. 10-26) and failed to refer him to a doctor "specializing in neck, back, and foot injuries."  (Doc. 10 at p. 16.).

The medical defendants adamantly deny they acted with deliberate indifference to Inniss' medical needs during the time relevant to this complaint or at any other time.  The defendants submitted affidavits and relevant medical records in response to the complaint filed by Inniss.  The Court has carefully and independently reviewed the plaintiff's medical records and concludes that the affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process.

Specifically, Defendant John Peasant, M.D. testified by affidavit as follows:

> My name is John Peasant, M.D. I am over the age of nineteen (19) years, and I have personal knowledge as to all matters stated herein.
>
> I am a medical doctor licensed to practice medicine in the state of Alabama. I am currently employed by Corizon, LLC, as the Medical Director at the Ventress Correctional Facility located in Clayton, Alabama.

Corizon currently holds the contract with the Alabama Department of Corrections ("ADOC") to provide health care related services to inmates incarcerated within Alabama state correctional facilities. Corizon has held the contract with the ADOC since November 1, 2007.

I have reviewed and I am familiar with the Complaint filed by inmate Ramon Rogelio Innis[3] (AIS# 304894). I am aware that Mr. Innis alleges that he has not received appropriate medical attention and care while incarcerated at the Ventress Correctional Facility. I am aware that Mr. Innis alleges that he was involved in an automobile accident in November 2013 and that he has not been provided with appropriate pain medications.

I have attached all pertinent medical records relating to Mr. Innis' medical attention since his incarceration at the Ventress Correctional Facility.

Mr. Innis is a non-compliant patient who intentionally chooses not to follow recommendations of his medical providers. Mr. Innis has a long record of refusing to accept treatment recommendations of his treating medical providers.

On July 22, 2016, Mr. Innis was initially incarcerated at the Kilby Correctional Facility. The initial intake stated that Innis did not have any obvious pain or bleeding or other symptoms suggesting the need for a doctor's care.

On July 25, 2016, Mr. Innis had an x-ray of his chest. This was part of the initial screening when Mr. Innis was initially incarcerated at the Kilby Correctional Facility. The radiologist read Mr. Innis' chest x-ray as follows:

Chest - One view (AP)
Results: The heart and mediastinum are normal. There is no pneumonia or effusion. No adenopathy is seen.  No acute bony abnormality is visible. The left hilum is prominent.
Conclusion: No pneumonia or  effusion.

As the result of Mr. Innis complaining of pain resulting from his motor vehicle accident in 2013, he was provided with restrictions while at the Kilby Correctional Facility on July 25, 2016, including no lifting over 20 pounds, no prolonged walking and no standing over 20 minutes. Mr. Innis was also given blood pressure checks daily for 14 days.

---

[3] The Court recognizes that throughout this affidavit Inniss is misspelled as Innis.

13

On August 1, 2016, Mr. Innis was seen by nurse practitioner Marianne Baker who performed a complete physical examination on Mr. Innis. Nurse Baker noted in her plan that the medical staff was to educate and monitor Mr. Innis, provide him with certain limited profiles and have him seen by the physician.

The nurse practitioner on August 1, 2016, wrote an order for Mr. Innis to be provided with a newer, firmer mattress because of Mr. Innis' history of multiple traumas.

On August 5, 2016, Mr. Innis was in fact seen by Dr. Rahming at the Kilby Correctional Facility.  Dr. Rahming, in his notes of August 5, 2016, stated the medications that would be provided to Mr. Innis. Dr. Rahming's medical notes state that Mr. Innis did not agree with Dr. Rahming and that Mr. Innis in fact stormed out of the room after being told the medications that he would be provided with.

On August 9, 2016, Mr. Innis was transferred to the Ventress Correctional Facility. Mr. Innis was scheduled to see the medical provider on August 18, 2016, but did not show up for his designated appointment.

His appointment was rescheduled for August 25, 2016. At that time, he was seen and examined by the nurse practitioner. The nurse practitioner ordered chemical and urine analysis, an eye examination, and certain limited restrictions.

On September 8, 2016, the medical records make a notation that Mr. Innis in fact refused to complete a consultation with me for September 8, 2016 medications.  The notation also states that Mr. Innis refused to sign the release of responsibility form.

Mr. Innis was in fact seen by a nurse on September 8, 2016 and a full and complete evaluation of Mr. Innis was performed. The nurse's notes state that Mr. Innis demanded certain medications be provided to him and when he was informed that he would not receive the medications requested by him that he again stormed out of the medical office.

An x-ray was ordered of Mr. Innis' cervical and lumbar spine and those x-rays were taken on September 9, 2016. The x-rays were read by the radiologist as follows:

C-Spine/Neck AP and LAT

Results: There is anatomic alignment of the cervical vertebrae. The vertebral bodies have normal shape and ossification pattern. Posterior elements are intact.

Ossipitocervical junction is normal, as 1s the C-1/C-2 relationship. No prevertebral soft tissue swelling or radiopaque foreign body is seen.

Conclusion: Normal cervical spine series. Shoulder complete, min. 2V, left.

Results: There is marked left acromioclavicular joint separation. Glenohumeral and coracoclavicular joints are intact. No fracture seen.

Conclusion: Marked left AC joint separation. Lumbar spine AP and LAT

Results: There is anatomic alignment of lumbar vertebrae. The vertebral bodies have normal shape and ossification pattern. Posterior elements are intact.

Conclusion: Normal lumbar spine series. Hip bilat W Pelvis 5 View

Results: Images of the bony pelvis in both hips demonstrate no evidence of fracture, dislocation or perosteal new bone formation. The mineralization of the regional skeleton is unremarkable. The soft tissues include in the examination are normal.

Conclusion: Normal examination of both hips and the pelvis. Femur min 2 views, left.

Results: Comparison: none.

Findings: Anatomic alignment is maintained. There is no acute fracture or dislocation. The soft tissues are unremarkable. There are no erosive changes seen.

Conclusion: Intact left femur. Tibia/fibula AP and LAT, left.

Results: Comparison: None

Findings: Anatomic alignment is maintained. There is no acute fracture or dislocation. The soft tissues are unremarkable.

There are no erosive changes seen. Conclusion: Normal left tibia and fibula. Ankle: Min 3V, left

Results: Ankle series. Comparison: None.
Findings: Anatomic alignment is maintained. There is no acute fracture or dislocation. The soft tissues are unremarkable. There are no erosive changes seen. The ankle mortise is intact.

Conclusion: Intact left ankle. Foot complete, min 3V, left
Results: Comparison: None.
Findings: Anatomic alignment is maintained. There is no acute fracture or dislocation. The soft tissues are unremarkable. There are no erosive changes seen.

Conclusion: Intact left foot.

Mr. Innis was again seen by the medical provider on September 23, 2016. The medical notations state that all x-rays taken of Mr. Innis were normal with the exception of the left shoulder.

Mr. Innis had another x-ray taken of his chest on October 31, 2016. The radiologist read that x-ray as follows:

Chest- one view (AP)
Results: Chest findings: No acute osseous or soft tissue abnormality. Cardiac and mediastinal contours are within normal limits. Normal pulmonary vasculature. No pneumothorax. No consolidation.

Impression:

No acute cardio pulmonary process. No focal pneumonia.
Conclusion: Findings are similar compared to July 25, 2016.

Further x-rays were taken of Mr. Innis' facial bones on December 30, 2016. The radiologist read those x-rays as follows:

Facial bones less than 3 views.

Results: The osseous structures are unremarkable including grossly intact orbital rims. Maxillary sinuses are unremarkable. No blow out fracture is seen.

Conclusion: Normal facial series.

16

Mr. Innis was seen by the medical staff in the health care unit at the Ventress Correctional Facility on January 4, 2017. Mr. Innis had been involved in an altercation with another inmate and had received lacerations to his mouth. Mr. Innis was seen and treated by the nurse practitioner.

On January 11, 2017, Mr. Innis had x-rays taken of his chest. The radiologist read Mr. Innis' x rays as follows:

Chest - 2 view (AP and LAT)

Results: The cardiac silhouette is normal. There is no radiographic evidence of pulmonary edema. There is no radiographic evidence of pneumonia. There is no pneumothorax visible. There is no abnormal foreign body.

Conclusion: There is no radiographic evidence of acute disease in the chest. The exam is limited by underexposed technique. The exam is overall not significantly changed compared with the prior dated 10/31/2016.

On January 25, 2017, Mr. Innis did not show up for his appointment with the medical doctor. Mr. Innis refused to be transported by security.

On February 11, 2017, Mr. Innis also refused health care and asked to leave the health care unit refusing to sign the waiver without being seen by medical personnel.

On February 16, 2017, Mr. Innis was written a prescription for an Albuteral nebulizer twice day for 90 days.

Mr. Innis was again seen on February 23, 2017. Mr. Innis again received complete physical examination from the medical provider.

On March 1, 2017, Mr. Innis refused his physician's appointment scheduled for March 1, 2017.

Mr. Innis was seen and evaluated by the nurse practitioner again on April 6, 2017.

The medical records again reveal that Mr. Innis refused to show up for his scheduled medical appointment to be seen by the medical provider on May 5, 2017.

The medical records also reveal that Mr. Innis refused to show up for a sick call appointment scheduled for May 10, 2017. However, Mr. Innis was again seen by the medical provider on May 24, 2017. Mr. Innis was brought to the health care unit in a wheelchair.

The medical records clearly reveal that Mr. Innis has been seen on multiple occasions by physicians, medical providers and nurses throughout the course of his stay at the Ventress Correctional Facility. Mr. Innis has had multiple x-rays taken, a majority of which have been negative with the exception of his left shoulder.  Mr. Innis has received appropriate prescribed medications much of which Mr. Innis disagrees, with.

Mr. Innis has also refused on multiple occasions to be seen by his medical providers at the prescribed appointments and has refused to follow prescribed medical treatment. At no time has Mr. Innis' medical treatment been denied or delayed.

l am aware of Mr. Innis' medical complaints, as well as his medical treatment during his incarceration at the Ventress Correctional Facility.

It is my opinion, based upon my first-hand knowledge of Mr. Innis medical treatment, as well as my education, training. and experience that Mr. Innis has always received medical treatment within the standard of care of physicians practicing medicine in the state of Alabama.

(Doc. 21-1 pp. 2–10).

The medical records further confirm that medical personnel at Ventress evaluated Inniss each time he appeared at sick call or medical appointments with complaints, assessed his need for treatment, prescribed medications to alleviate the pain associated with his condition when they deemed such necessary, issued medical profiles as warranted, and provided treatment to Inniss in accordance with their professional judgment.  Moreover, these records confirm that Inniss failed to appear for multiple appointments.  (Doc. 21-1 pp. 1–62).

The plaintiff also admits in his complaint that he received treatment including medications for asthma and pain.  However, he argues that he has not been given enough medication and needs to see a neck, back and foot specialist.  (Doc. 10 at pp. 5, 9).  Specifically, following the altercation on December 30, 2016, he admits, that within a couple of hours he was seen by medical personnel, x-rays were taken, and steri-strip bandages were applied to his wounds.  (Doc. 10 at p. 11).  He also admits that he was seen again by medical personnel on the evening of December 30th and his wounds were cleaned and rebandaged.  (Doc. 10 at p. 12).

He further admits that he was seen by medical personnel again after the altercation because he was vomiting and could not breath.  He admits that he was given an inhaler and "his breathing returned to normal" and his wounds were cleaned and rebandaged.  Additionally, the plaintiff states that he was given two shots which contained an antibiotic and pain medicine and that his blood was drawn for lab work.  (Doc. 10 at pp. 13–14).  He also admits that on January 2, 2017, he was seen by Dr. Peasant and explained that he needed his pain and nerve medication to be increased "to what the plaintiff has taken for several years which is double to what plaintiff is being given now, which does not control plaintiff's pain at all but just suppresses enough of plaintiff's pains to allow the plaintiff some functioning without as much pain."  (Doc. 10 at p. 15).  He states that he was again given shots for pain and infection.  (Doc. 10 at p. 16).  Accordingly, the Court concludes that the plaintiff fails to demonstrate that the defendants have acted with deliberate indifference to his medical needs.

With respect to Inniss' specific complaints that defendants failed to respond to his grievances, the records show that these complaints are baseless.  Indeed, Defendant Nettie Burks, Health Services Administrator at Ventress, testified by affidavit that she received two medical grievances from the plaintiff – one was dated February 17, 2017 and the other dated March 6, 2017. (Doc. 46, Ex. C).  The Court has independently reviewed the supporting grievance documents and concludes that Defendant Burks responded to both of Inniss' grievances.  Specifically, with respect to the February 17, 2017, grievance, Defendant Burks responded on March 14, 2017, as follows: "Medical doesn't refuse breathing treatments if needed and ordered.  You see medical duty in a few days."  (Doc. 10-2 at p. 85).   Further, with respect to the March 6, 2017 grievance, Defendant Burks responded on March 8, 2017 as follows: "According to the MAR you're getting the medication that's been ordered by the doctor.  You also use a wheel chair." (Doc. 10-2 at p. 86).  Accordingly, the Court concludes that summary judgment is due to be granted in favor of the defendants on the plaintiff's claims that defendants failed to respond to his grievances.

Under the circumstances of this case, the Court concludes that the course of treatment undertaken by the medical staff at Ventress did not violate Inniss' constitutional rights.  Specifically, there is no evidence upon which the court could conclude that any member of the medical staff who provided treatment to Inniss acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Rather, the evidence before the court, including the plaintiff's own statements in his complaint, demonstrate that

medical personnel examined Inniss upon his placement in Ventress and following the
December 30, 2016 altercation, performed multiple x-rays on Inniss, and prescribed
medications to Inniss in an effort to treat his pain and asthma.  Whether medical personnel
"should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic
example of a matter for medical judgment' and therefore not an appropriate basis for
grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal
citation omitted).  In addition, to the extent Inniss complains that his physicians should
have allowed continuous prescriptions for pain relievers or pursued a mode of treatment
other than that prescribed, this allegation does not "rise beyond negligence to the level of
[deliberate indifference]."  *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*,
774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment
does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d
at 1344 (holding that simple divergence of opinions between medical personnel and
inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not
constitute deliberate indifference.  Inniss' self-serving statements of a lack of due care and
deliberate indifference do not create a question of fact in the face of contradictory,
contemporaneously created medical records.  *Whitehead*, 403 F. App'x 401, 403 (11th Cir.
2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no reasonable
jury could believe it, a court should not adopt that version of the facts for purposes of ruling
on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244,

1253–54 (11th Cir. 2013) (same).  In addition, Inniss' has failed to present any evidence showing that the manner in which the medical defendants addressed his conditions created a substantial risk to his health that the attending health care personnel consciously disregarded.  The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Inniss.  Consequently, summary judgment is due to be granted in favor of the medical defendants.

### 3.    Correctional Defendant.

To the extent Inniss argues that Warden Karla Jones acted in a manner to prevent him access to treatment from professional medical personnel while incarcerated in the state prison system, the Court concludes that this argument lacks merit.  Indeed, it is clear from the medical records that Warden Jones was not in any way involved in decisions regarding the medical treatment provided to Inniss as these decisions are made solely by healthcare professionals employed by Corizon.

Indeed, Inniss has failed to establish deliberate indifference on the part of Warden Jones.  Specifically, Inniss has not demonstrated that she was aware of facts establishing "an objectively serious medical need" nor that she disregarded any known serious risk to Clark's health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate

significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Consequently, summary judgment is due to be granted in favor of Warden Jones on Inniss' claim alleging deliberate indifference arising from the actions of medical personnel in treating his pain.

Insofar as Inniss seeks to hold Warden Jones liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that Warden Jones exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious

23

liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949.  Thus, liability for actions of the correctional defendants could attach to the other named defendants only if these defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that Warden Jones did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Inniss. The evidentiary materials before the court demonstrate that medical personnel made all

decisions relative to the treatment provided to Inniss and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, Warden Jones can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Inniss' constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of Warden Jones, Inniss must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Inniss has failed to meet this burden.

The record before the Court contains no probative evidence to support an inference that Warden Jones directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Inniss has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Inniss had continuous access to medical personnel and received treatment for his pain. The undisputed records also

25

demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by Warden Jones.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the Warden Jones with respect to liability based on the theory of respondeat superior. Furthermore, even had Inniss presented a proper basis for the claims lodged against Warden Jones, the evidentiary materials before the court, including Inniss' own statements and his medical records, demonstrate that health care personnel did not act with deliberate indifference to his medical needs.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     The defendants' motion for summary judgment be GRANTED.

2.     Judgment be GRANTED in favor of the defendants.

3.     This case be DISMISSED with prejudice.

4.     Costs be taxed against the plaintiff.

On or before **February 11, 2020** the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by

the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 28th day of January, 2020.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE